IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

**MARTHA BLENKO, and**
**LAURA MULLARKY, individually**
**and on behalf of all others similarly situated,**

    Plaintiffs,

v.                                  CIVIL ACTION NO. 3:21-cv-00315

**CABELL HUNTINGTON HOSPITAL, INC.,**

    Defendant.

## COMPLAINT

1. Plaintiffs, Martha "Marty" Blenko and Laura Mullarky, as retired, non-union employees of Defendant Cabell Huntington Hospital, Inc., ("Cabell") bring this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, seeking equitable remedies for misrepresentations by Cabell regarding lifetime retiree health and welfare benefits.

2. Cabell repeatedly represented to Plaintiffs they could retire as non-union employees beginning at age 62 and retain their health insurance if they had attained 17 years of credited service. Cabell further informed the Plaintiffs Cabell would provide comparable health insurance to the non-union retirees until they became Medicare-eligible, and that Cabell would then provide a comparable, cost-free Medicare supplement throughout the rest of those retirees' lives.

3. The actions and omissions of the Defendant, by and through its agents, as set forth herein, breached the Defendant's fiduciary duties by misleading the Plaintiffs regarding their

1

retiree welfare benefits and inducing Plaintiffs to retire based on misrepresentations about their likely receipt of future benefits under the operative welfare benefit plan.

4. Defendant also failed to timely provide Plaintiffs with a copy of the summary plan description ("SPD") when the Plaintiffs first became participants in the relevant plan. Specifically, Defendant failed to timely provide Plaintiffs with a copy of the SPD when it adopted a new retiree welfare benefits plan in 2019, and yet continued misrepresenting the retiree welfare benefits would remain the same as they had been under the prior plan in place from 1955 to 2019.

5. Plaintiffs seek for this Honorable Court in equity to compel the Defendant to place them in the position they reasonably expected to occupy had the Defendant provided the retiree welfare benefits as they represented, and as the Defendant indeed had done for many years.

6. At no time prior to Plaintiffs' retirement did the Defendant inform the Plaintiffs Defendant reserved a right to materially alter or to terminate the retiree welfare benefits it had promised to the Plaintiffs.

7. In January 2021, Defendant announced the termination of welfare benefits for non-union Cabell retirees effective March 31, 2021, which Defendant later extended to September 2021.

8. Plaintiffs seek a preliminary injunction to prevent the curtailment or termination of retiree welfare benefits because the loss of benefits would cause the retirees immediately to postpone or forego critical medical care during a medically-vulnerable time as the population seeks to emerge from a global pandemic.

**JURISDICTION AND VENUE**

9. Jurisdiction over Plaintiffs' ERISA claims is founded on the existence of a federal question. This action arises under ERISA, 29 U.S.C. § 1001, et seq., and jurisdiction is conferred pursuant to 29 U.S.C. § 1132.

10. Venue is proper in this District pursuant to ERISA, 29 U.S.C. § 1132(e)(2), because this District is where the actions that form the basis for this Complaint took place.

## PARTIES

11. Plaintiffs Blenko and Mullarky were at all times relevant residents of Cabell County, West Virginia.

12. At all relevant times, Defendant Cabell was a West Virginia non-profit corporation with its principal place of business located at 1340 Hal Greer Boulevard, Huntington, West Virginia 25701.

13. Cabell Huntington employed several individuals who performed tasks comprising fiduciary functions for the Defendant's health and welfare benefit plans, including the Benefits Administrators and their supervisors within the human resources and benefits staff.

14. At all relevant times, Defendant operated one or more medical facilities in Huntington, West Virginia, at which the Plaintiffs were employed for at least 17 years before retiring.

## STATEMENT OF FACTS

15. Cabell operated a unified health and welfare plan for both active and retired workers from 1955 through 2019 (the "Original Plan"), numbered Plan 501.

16. Throughout the time that they worked at Cabell, Plaintiffs were never members of the Service Employees International Union (SEIU) or any other union.

17. The administrator of all of the employee welfare benefit plans at issue in this matter was at all times relevant exercised final judgment on behalf of those plans as their administrator, and conducted business at 1340 Hal Greer Boulevard, Huntington, West Virginia 25701.

18. The plan administrator at the time of the termination of the plan, serving as both a named fiduciary and/or functional fiduciary for the Defendants' retiree welfare plan and was also at all relevant times named Vice President of the Board of Directors of Cabell Huntington.

19. Defendants' human resources staff repeatedly informed the Plaintiffs and their co-workers – verbally and in writing – Cabell would pay the premiums for retiree welfare benefits throughout the lives of the Plaintiffs upon attainment of specified conditions for retirement, and that the spouses of retirees would receive health insurance under Cabell's welfare benefits plan until age 65.

20. Defendants never stated that Cabell Huntington reserved the right to terminate retiree welfare benefits.

***Marty Blenko***

21. Plaintiff Blenko was first employed by Cabell in August 1991 as a speech pathologist. She was hired by Tom Haun in the Personnel Department (later known as Human Resources).

22. Blenko was initially interviewed by the Rehabilitation Department, and then interviewed by Haun from Personnel. Haun represented in the pre-employment interview Blenko and her spouse would have health insurance upon retirement for the rest of her life, along with coverages for certain family members provided under the Plan.

23. Haun further stated that Blenko would earn holiday pay and sick time from Cabell.

24. Haun's description of retirement welfare benefits was a significant factor Blenko relied upon in deciding to accept Haun's offer of employment at Cabell.

25. For roughly eleven years prior to and up until the time that she accepted her job at Cabell, Blenko was employed as a speech pathologist by the Cabell County West Virginia Board of Education and was covered by Public Employees Insurance ("PEIA"), which did and does continue today to provide retiree insurance for eligible retirees.

26. ***Promise of Lifetime Medical.*** Beginning with a major union strike at Cabell in 1997, Cabell's Personnel Department began emphasizing to non-union employees – specifically to the registered nurses and the professional employees like Plaintiffs – that Cabell continued to appreciate them not joining the union and that they would be rewarded with future benefits of lifetime insurance.

27. ***Annual Benefits Meetings.*** The Personnel Department conducted benefits meetings on an annual basis throughout most of the time Plaintiffs worked at Cabell.

28. In those meetings, Human Resources would review the benefits provided by Cabell to its employees and would inform them of any alteration or changes to future benefits.

29. At no time during those annual meetings did Cabell's HR representatives announce any change to the retiree welfare benefits.

30. ***Retirement.*** At age 63 in 2018, Blenko retired from Cabell.

31. In February 2018, in order to retire, Blenko called HR representative and Cabell's benefits administrator, Becky Wells, and informed Wells of her intention to retire.

32. Later in February 2018, Wells and Blenko met to discuss retirement. Wells explained Blenko's retirement insurance benefits, stating that her coverage would continue until age 65, and once she turned 65, her husband would lose his coverage and Blenko would have cost-

free supplement for the rest of her life. Wells informed Blenko that she had to sign up for Medicare A and B, but that Cabell would continue paying the supplement and the prescription drug policy for the rest of Blenko's life.

33. After that, shortly before Blenko's retirement in May of 2018, Wells and Blenko met for a second time to complete additional paperwork to consummate the retirement.

34. In the second meeting Wells confirmed verbally that Blenko's husband, Richard, would not have to sign up for Medicare Part B until Blenko turned 65.

35. When Richard eventually signed up for Part B, Marty and Richard incurred a penalty due to his delayed enrollment.

36. At the time of Blenko's retirement, she had accrued 1240 hours of rolled-over sick time, which was the maximum amount permitted for accrual under Cabell's personnel policies.

37. The value of this accrued sick-time was roughly $60,000.00.

**Laura Mullarky**

38. Plaintiff Mullarky was first employed by Cabell beginning in 1980 for a period of roughly 14 months as a staff nurse on the surgical floor.

39. From 1982 to 1986, Mullarky worked as a registered nurse in the Huntington area.

40. From 1987 to August of 2019, except for a period of roughly one year around 1999, Mullarky was employed by Cabell as a registered nurse in the float pool in various areas all over the hospital, as well as in neurology, medical surgery, home health, diabetes care, and perinatal.

41. *Orientation.* In 1987, Mullarky participated in a lengthy orientation, in which a representative of the Personnel Department explained that Cabell represented if Mullarky met the requirements for years of service, she could retire at age 62 and have insurance paid for in full

until age 65, and then Cabell would cover the full cost of premiums for a supplement for the rest of her life.

42.  When Mullarky returned to Cabell in or around 2000, Cabell's benefits administrator told her she could choose to retire at age 62 or older with the number of years of service required, and that if she was below 65 and without Medicare, and chose to retire, Cabell would pay her insurance premiums until she turned 65 and obtained Medicare and that Cabell would then be her Medicare Supplement and would pay this premium as long as she lived. The benefits administrator further told her that her husband could remain on her insurance when she retired, until her husband turned 65, and then he must get Medicare himself and that Cabell would be his supplemental and pay his premiums as well until she turned 65.

43.  *Annual meetings.*  Cabell held annual benefit meetings. On several occasions, Mullarky attended these meetings and asked questions about her benefits – always understanding that Cabell's promise remained the same regarding lifetime retirement medical.

44.  *Union organizing.* During the early 1990s, the SEIU attempted to organize the nurses at Cabell.  Mullarky eschewed the union in reliance on Cabell's representation regarding her lifetime retirement welfare benefits.

45.  In 2019, Cabell Huntington professional employees voted to organize with the SEIU.

46.  During the union organizing campaign in 2019, Cabell CEO Mike Mullins presented to workers in assembly about their health and welfare benefits.  However, at no time did he mention any reservation of right to terminate retiree welfare benefits or distribute any document containing such reservation.

47.  On or about January 15, 2021, the contract was ratified and signed with the SEIU.

48. ***Retirement.*** On November 30, 2019, Mullarky retired from Cabell Huntington.

49. On or about early October 2019, in order to retire, Mullarky initially met with Becky Wells, and informed Wells of her interest in retiring.

50. In November 2019, Mullarky and her husband Mike came back for a second meeting with Becky Wells in order to formalize the retirement.

51. Wells verbally reiterated to Laura and Mike Mullarky at the second meeting that the retiree welfare benefits remained as Mullarky had understood them up to that point: Laura would remain fully insured until she turned 65, and Mike had to secure Medicare upon turning 65, and Cabell would continue to cover the full cost of a Medicare supplement for Laura after she turned 65 and for the rest of her life.

52. Wells presented no paperwork to Mullarky regarding her retirement during either of these meetings.

53. Mullarky would not have retired early had Defendant not misled her as it did regarding retiree healthcare benefits.

*Cabell Announces Termination of Retiree Welfare Benefits.*

54. On January 28, 2021, Cabell issued a form letter addressed to "Dear Retiree," which Plaintiffs received, stating that they would terminate retiree welfare benefits on March 31, 2021. The letter stated that, as of April 1, 2021, the Pre-65 retirees would be charged a premium to cover a portion of the cost of the coverage if they chose to remain enrolled in the plan and that such coverage would then terminate when they turned 65 or first became Medicare-eligible.

55. On February 12, 2021, Cabell issued a second form letter addressed to "Dear Retiree," which Plaintiff Blenko also received, stating that Cabell was extending benefits to May 31, 2021. Mullarky did not receive this letter.

56. On March 8, 2021, Cabell issued a third form letter, which Plaintiff Mullarky received, stating that Cabell was extending benefits to June 30, 2021. Blenko did not receive this letter.

57. On April 1, 2021, Cabell issued an additional letter extending retiree healthcare coverage through September 30, 2021 and offering to deposit $250 per month into a Health Reimbursement Account (HRA) in lieu of providing the Medicare Supplement. However, in the April 1 letter, Cabell asserted a right to terminate the HRA and its funding at any time.

58. As to the under-65 retirees, Cabell further announced it would pay 100% of retirees' medical and prescription benefits until 6/30/2021, and effective 7/1/2021, retirees will begin paying a portion of the premium for their Pre-65 Retiree Health Plan (medical and prescription drug). This coverage would then terminate on September 30, 2021, leaving only the HRA.

***Discovery of Breach.***

59. Plaintiffs discovered that the Defendant's written and oral promises of lifetime retiree welfare benefits were misrepresentative when the Defendant notified Plaintiffs on or about January 2021 it was terminating all retiree welfare benefits.

60. Plaintiffs were not aware more than six years prior to the filing of this Complaint, and were not possessed of information from which they ought to have been aware that the Defendant asserted a right to terminate retirement welfare benefits.

***Defendant Represented a Promise or Offer of Lifetime Retiree Welfare Benefits, and Received Value from Plaintiffs in Exchange for that Offer***

61. The Defendant's aforementioned oral and written offers and promises regarding the lifetime medical and prescription drug benefits were accepted by the Plaintiffs when they continued working for the Defendant based in substantial part on those offers and promises of lifetime benefits.

62. The Plaintiffs paid consideration for the Defendant's offers of lifetime benefits by assenting to payroll deductions that the Defendants withheld from Plaintiffs' wages throughout their working lives.

63. The Defendant's offer to provide a Health Reimbursement Account reflects the financial feasibility of providing the promised benefits in an ongoing fashion.

***Defendants Failed to Provide Summary Plan Descriptions ("SPDs") to Plaintiffs When They First Participated in the Original Plan, or When They First Participated in the New Retiree Plan Adopted in 2019***

64. Defendant did not provide a summary plan description ("SPD") of the applicable health and welfare benefit plans to the Plaintiffs before their retirement.

65. Defendant did not provide an SPD of the applicable health and welfare benefit plans within 120 days of Plaintiffs' becoming participants in either of those plans.

66. Defendant promulgated a new Retiree Welfare Plan in 2019, numbered Plan 506.

67. The Plaintiffs were participants in both plans at all relevant times.

68. Defendant did not provide Plaintiff with an SPD for the Retiree Welfare Plan.

69. Defendants did not provide Plaintiff with an SPD for the Retiree Welfare Plan within 90 days after he became a participant in that plan.

70. Upon information and belief, the SPD for the Retiree Welfare Plan contained reservations of rights to terminate the plan.

71. Plaintiffs did not receive the chance to review and evaluate any alleged reservations of rights contained in the SPD because Defendant did not disclose them to the Plaintiffs within the initial time frames required by ERISA following the commencement of Plaintiffs' plan participation.

*Defendants' Misrepresentations and Omissions Were Material, and Defendants' Failure to Pay Promised Benefits to Plan Participants Conferred Financial Benefits on the Defendants at the Expense of Plaintiffs and Other Plan Participants.*

72. In misrepresenting the scope and nature of the Retiree Welfare Benefits while failing to produce the SPD for the Retiree Welfare Plan within the timeframe required by ERISA, the Defendant concealed material information about the plan from the Plaintiffs while affirmatively misrepresenting the value, scope, and duration of the benefits for which the Plaintiffs were eligible under the Plan.

73. Upon information and belief, the above misrepresentations offered significant potential for financial gain to Defendants. By offering incomplete, inaccurate, and misleading disclosures, Defendant was able to induce employees to forego unionization, accept lower wages, continue working for Defendant, and forego other employment, in reliance on the promise of lifetime benefits, all of which redounded to the Defendant's financial advantage.

74. At all relevant times, Cabell has been the sponsor of the Original Plan and the New Retiree Plan within the meaning of ERISA, 29 U.S.C. § 1002(16)(b) because it has been so designated in the governing plan instruments.

75. Plaintiffs are entitled to bring this civil action to restore their healthcare benefits, to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, to disgorge the financial benefits of the Defendant's breach of its fiduciary duties, and/or to obtain other appropriate equitable relief, including but not limited to plan reformation and a surcharge against the Defendants for the value of benefits terminated and the premiums accepted by CONSOL. *See* 29 U.S.C. § 1132(a)(1), (2), (3).

## CLASS ALLEGATIONS

76. Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated individuals, pursuant to Rule 23 of the *Federal Rules of Civil Procedure*. The class consists of all individuals participating in the non-union retiree welfare benefit plan No. 506 sponsored by Cabell Huntington Hospital, Inc. in 2021.

77. The requirements of Rule 23(a) are satisfied as follows:

   (a) The class is numerous, with roughly 180 members, and joinder is impracticable due to the high number of plaintiffs that would frustrate the coordination of multi-plaintiff litigation involving so many affected individuals;

   (b) There are questions of law and fact common to all members of the class, which predominate over any questions affecting only individual members, regarding the ERISA plans and the facts surrounding the entry of those plans and the conditions of their curtailment or termination; and

   (c) The named Plaintiffs' claims are typical of those of the class as a whole because the named Plaintiffs were subject to the same curtailments and terminations, and were injured as a result, in the same manner as were the rest of the putative class members.

   (d) The Plaintiffs have displayed an interest in vindicating the rights of the class members, will fairly and adequately protect and represent the interests of the class, and are represented by skillful and knowledgeable counsel. The relief sought by the named Plaintiffs will inure to the benefit of the class generally.

78. The requirements of Rule 23(b) are also satisfied as follows:

(a) Prosecuting separate actions by individual class members would create a risk of: (1) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (2) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(b) Defendant Cabell has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole;  and

(c) Q questions of law and fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### 29 U.S.C. § 1104(a)(1)(a)(i)

79. Plaintiffs incorporate the preceding paragraphs by reference.

80. At all relevant times, Defendant was a fiduciary to the Plaintiffs as defined in 29 U.S.C. § 1002(21).

81. The Defendant is a fiduciary with respect to the terms of enrollment and the scope of benefits in the applicable health and welfare plans because it exerted control or authority over the management, administration, and/or disposition of the terms or assets of that plan, and because Defendant appointed other fiduciaries or apparent fiduciaries, including Defendant's human resources staff, and other salaried employees to interpret, apply, confirm, and control those same terms.

82. 29 U.S.C. § 1104(a)(1) requires that a fiduciary must discharge his or her duties with respect to a plan solely in the interest of the participants and beneficiaries, and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan.

83. By misrepresenting the lifetime nature of retiree welfare benefits and failing to disclose the relevant SPDs in a timely fashion, Defendant acted in ways that were financially valuable for Defendant but were to the Plaintiffs' detriment as plan participants.

84. When the Defendant represented to the Plaintiff that Cabell's health plan would provide health benefits for the lifetimes of the Plaintiffs and coverage for their dependents up to retirement age, the Defendant materially misrepresented the Plan.

85. When the Defendant accepted the Plaintiffs' continued employment in exchange for the promise to provide benefits for life, and as set forth above, the Defendant fraudulently induced the Plaintiffs into laboring under terms and conditions that would otherwise not have been acceptable to Plaintiffs.

86. When the Defendant failed to produce the SPD for the Retiree Welfare Plan, they fraudulently concealed the full terms of the plan as contained in the SPD.

87. Defendant thus violated ERISA, 29 U.S.C. § 1104(a)(1) by breaching their fiduciary duties when they took action to increase revenue for the corporate sponsor of the plan by concealing the SPD, which contained important plan terms, and by misrepresenting the benefits to the plan beneficiaries, thus acting for the Defendant's own financial benefit and not exclusively for the purpose of providing benefits to plan participants and their beneficiaries.

## SECOND CAUSE OF ACTION
**Plan Reformation, Estoppel, and Surcharge**
**based on Defendants' Misrepresentations and Breach**
**29 U.S.C. §§ 1132(a)(1), (2), and (3)**

88. Plaintiffs incorporate the preceding paragraphs by reference.

89. Defendant's misrepresentative conduct warrants the award in equity of plan reformation to provide Plaintiffs with retiree healthcare benefits and a supplement comparable in value to those promised to the Plaintiffs and their coworkers.

90. Defendant's misrepresentative conduct, and substantial failures to disclose SPDs timely, warrant the equitable estoppel of Defendant from relying on reservations of rights in its SPDs to deny such comparable benefits to Plaintiffs, and further to estop the Defendant from denying Plaintiffs' claims for covered medical expenses.

91. Defendant's misrepresentative conduct warrants the award of equitable surcharge in the amount of premiums deducted from Plaintiffs' wages and received from Plaintiffs as premium payments in retirement, all of which Plaintiffs paid pursuant to Defendant's misrepresentations, omissions, and fraudulent concealment about the nature, scope, and duration of the retiree healthcare benefits.

**THIRD CAUSE OF ACTION**
**Failure to Meet Duty of Disclosure with Respect to Summary Plan Descriptions**
**29 U.S.C § 1021(a)(1)**

92. Plaintiffs incorporate the preceding paragraphs by reference.

93. ERISA, 29 U.S.C. § 1021, requires that plan administrators provide all plan participants and beneficiaries with accurate SPDs, conforming to the requirements of 29 U.S.C. § 1022(a).

94. 29 U.S.C. § 1022(a)(1) requires that SPDs be sufficiently accurate and comprehensive to reasonably apprise participants of their rights and obligations under the plan.

95. Defendant failed to provide Plaintiffs and plan participants with SPDs or provided incomplete SPDs.

96. By failing to produce SPDs with complete information about benefits that the plan confers upon retirement, Defendant concealed information that could have helped Plaintiffs to realize the Defendant's misrepresentations about their retiree health care benefits.

97. By failing to provide accurate or comprehensive SPDs, Defendant violated its duty of disclosure under 29 U.S.C. § 1021.

98. Plaintiff is entitled to bring this civil action to enjoin any act or practice which violates any provision of ERISA or the terms of the Plan, and/or to obtain other appropriate equitable relief.  *See* 29 U.S.C. § 1132(a)(3).

### FOURTH CAUSE OF ACTION
**Failure to Provide Accurate and Comprehensive Summary Plan Description**
**29 U.S.C § 1022(a)**

99. Plaintiffs incorporate the preceding paragraphs by reference.

100. Defendant's failure to distribute an SPD as hereinbefore alleged violates 29 U.S.C. § 1022(a) and the SPD requirements contained therein.

### FIFTH CAUSE OF ACTION
**Failure to Provide an Adequate Summary Plan Description in a Timely Manner**
**29 U.S.C. § 1024(b)(1)**

101. Plaintiffs incorporate the preceding paragraphs by reference.

102. ERISA at 29 U.S.C. § 1024(b)(1) requires that plan administrators and sponsors produce an accurate copy of the SPD to plan participants and beneficiaries in a timely manner.

103. Defendant failed to provide an accurate SPD to plan participants and beneficiaries, including Plaintiffs, for years after they became covered by the relevant plans.

104. Because Defendants failed to provide an accurate SPD within the required 90-day or 120-day period, they violated 29 U.S.C. § 1024(b)(1).

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs pray that the Court:

I. Enjoin Defendant from any further violation of their fiduciary duties under ERISA by restoring the healthcare benefits that have been announced for curtailment;

II. Compel the Defendants to honor the terms of the retirement healthcare plan entered into by Defendant and Plaintiffs, requiring Defendant to provide Plaintiffs and their beneficiaries with the lifetime benefits as set forth herein, or require the Defendants to pay a surcharge for the present value of the benefits they terminated for the Plaintiffs;

III. Hold that Defendant is estopped from relying on the terms (*i.e.*, reservations of rights) in the SPDs or plan documents insofar as they were not timely provided to Plaintiffs and they conflict with the Defendant's misrepresentations about retiree healthcare benefits;

IV. Award such other equitable or remedial relief as may be appropriate, including disgorgement of the financial benefit obtained by the Defendant through their breach of their fiduciary duties;

V. Certify a class of all individuals participating in the non-union retiree welfare benefit plan No. 506 sponsored by Cabell Huntington Hospital, Inc. in 2021, and appoint Plaintiffs as class representatives;

VI. Award to Plaintiffs and their attorneys all reasonable attorney fees, costs, and expenses incurred or earned by them, respectively, pursuant to 29 U.S.C. § 1132(g); and

VII. Grant any such other and further relief as this Court may deem equitable and just.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

            **Respectfully Submitted,**
            **MARTHA BLENKO and**
            **LAURA MULLARKY, individually**

and on behalf of all others similarly situated,
**By counsel:**

\_\_/s/ Samuel B. Petsonk_____

Samuel B. Petsonk (State Bar ID No. 12418)
Petsonk PLLC
PO Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com


Bren J. Pomponio (WVSB #7774)
Laura Davidson (WVSB #13832)
Mountain State Justice, Inc.
1217 Quarrier Street, Suite
Charleston, West Virginia 25301
(304) 344-3144
(304) 344-3145 (fax)
bren@msjlaw.org
laura@msjla.org