IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

MARTHA BLENKO and
LAURA MULLARKY, individually
and on behalf of all others similarly situated,

           Plaintiffs,

v.                                         CIVIL ACTION NO.  3:21-0315

CABELL HUNTINGTON HOSPITAL, INC.,

           Defendant.

**MEMORANDUM OPINION AND ORDER**

Presently pending before the Court is Plaintiffs' Motion for Class-Wide Preliminary Injunction. ECF No. 10. The Court held a hearing pursuant to this Motion on September 23, 2021, and subsequently required additional briefing on the issue of potential equitable remedies. For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion.

**I. BACKGROUND**

This case arises out of Cabell Huntington Hospital's (Defendant) decision to amend its retiree healthcare benefits plan. Defendant served as administrator of all the employee welfare benefit plans and, in this role, operated a unified health and welfare plan for active workers and retirees from 1955 through 2019, which was called Plan 501. This Plan was not formally recorded in writing until 2013. Once Plan 501 was written in a formal document, this Plan contained what is known as "Reservation of Right" language, which stated that, although Defendant planned to continue the Plan indefinitely, it reserved the right to amend, modify, change, or terminate the Plan at any time and for any reason. *See* ECF No. 14-3 § 6.1. Further,

the Plan indicated that Defendant did not "guarantee the continuation of any Benefits during employment or after termination thereof." *Id.* § 6.2. Defendant claimed that the only Plan document for the 501 Plan was both the Plan document and the Plan's Summary Plan Document (SPD). Defendant was statutorily obligated to distribute an SPD for the Plan, but it is undisputed that Defendants never distributed any SPD. Since the beginning of Plaintiffs' employment with Defendant, Plaintiffs allege Defendant's human resources staff repeatedly informed Plaintiffs and co-workers that Defendant would pay premiums for retiree welfare benefits through Plaintiffs' lifetimes once they had met the conditions for retirement. Defendant's staff also informed Plaintiffs that retiree spouses would receive health insurance under Defendant's welfare benefits plan until the spouses reached the age of 65. Plaintiffs allege that, prior to the January 2021 letter, they were not informed of Defendant's right to terminate retiree welfare benefits.

In 2019, Defendant adopted a new "wrap" welfare benefit plan referred to as the 506 Plan. This Plan provided that:

> The cost of the benefits provided through the Component Benefit Plans may be funded in part by Employer contributions and in part by Employee contributions…. Cabell Huntington Hospital, Inc. will determine and periodically communicate the Employee's share of the cost of the benefits provided through each Component Benefit Plan, and it may change that determination at any time. The Employer will make its contributions in an amount that in Cabell Huntington Hospital Inc.'s sole discretion determines is at least sufficient to fund the benefits or a portion of the benefits that are not otherwise funded by Employee contributions….

ECF No. 23-3 § 2.6. The plan also contained right to amend and right to terminate language. *Id.* §§ 5.1, 5.3. A separate SPD document for the 506 Plan contained the right to terminate and right to amend language. ECF No. 14-19, at 28. Although this document was made available to employees at any time, as Defendant posted it online, this document was never distributed by

Defendant to Plan participants and beneficiaries as required by statute. Plaintiffs were informed that the Plan was available to them upon request or online.

In October of 2019, Defendant distributed to employees and retirees an open enrollment guide for insurance coverage with respect to the 506 Plan. *See* ECF Nos. 23-1, 23-4. These guides contained the language that Defendant reserved the right to amend or terminate the Plan and informed participants to look to official Plan documents for complete information regarding benefits. *See id.* This document also explained that the descriptions of the Plan were not guarantees of any benefit coverage.

In 2021, Defendant decided to terminate the retiree welfare benefits. A letter was sent to retirees on January 28, 2021, which announced that, effective March 31, 2021, Post-65 retirees would no longer have coverage under the Plan and that Pre-65 retirees would be charged a premium to cover a portion of the cost of coverage under the Plan if they chose to remain enrolled. This coverage would terminate for the Pre-65 group once they turned 65 or first became Medicare eligible. On February 12, 2021, Defendant issued a letter to Post-65 retirees informing them that Defendant would extend benefits through May 31, 2021. On March 8, 2021, Defendant issued a letter to Pre-65 retirees extending their benefits to June 30, 2021.

Defendants next issued a letter to retirees in April 2021 which extended Post-65 benefit coverage through September 30, 2021, and moving forward, offered to retirees to deposit $250 a month into a Health Reimbursement Account (HRA) to pay for retirees' healthcare. However, this letter, unlike the others, informed the retirees that Defendant reserved right to terminate the benefits under the Plan at any time. Additionally, Defendant issued to Pre-65 retirees a letter that it would pay for these retirees' medical and prescription benefits through the end of June, and

that effective July 1, 2021, retirees would have to pay a portion of their premium for their medical and prescription drug healthcare.

After the commencement of the current lawsuit, Defendant once again extended benefits to Pre-65 retirees through October 1, 2021. On August 13, 2021, Defendant issued a letter notifying Pre-65 retirees that if they wished to enroll in a lower-cost high-risk plan, they would have to take action by September 7, 2021. On August 20, 2021, a letter was sent to Post-65 retirees which reiterated that Defendant would terminate retirees Medicare supplement on September 30 and informed retirees that they could join an information session to learn how to use the HRA.

This litigation commenced on May 25, 2021, when Plaintiffs filed their Complaint, ECF No. 1, claiming breach of fiduciary duty in violation of ERISA and violations of ERISA with respect to Plan SPD distribution. Plaintiffs subsequently filed this current Motion for Class-Wide Preliminary Injunction on August 26, 2021. ECF No. 10. The Court held a hearing regarding the parties' arguments on September 23, 2021. ECF No. 29.

At the hearing, Plaintiffs testified persuasively that they understood that after retirement Defendant would continue to provide them with health insurance, through a Medicare supplement, at no cost to them, for life. Each Plaintiff testified that they were informed repeatedly over the years that their health insurance essentially would continue at no cost to them once they retired. Further, each Plaintiff stated that, as retirement eligibility was approaching, they met with Defendant's benefits administrator, Becky Wells, who confirmed this understanding. Ms. Wells herself confirmed Plaintiffs' testimony and admitted that she had the same belief.

Unfortunately, this belief was contrary to the terms of Defendant's Plan and was contradicted by both written Plans and other documents. In fact, those Plan and other documents expressly reserved to Defendant the unilateral right to amend, modify, change, or terminate the Plan at any time and for any reason and to change its cost sharing coverage. ECF No. 23-3 §§ 2.6. 5.1, 5.3.

The Court does not doubt that Plaintiffs were misinformed about the "lifetime" entitlement to benefits. In most other contexts, this proof would likely lead to holding Defendant to the representations its staff made to Plaintiffs and other employees. However, this case arises out of Congress' comprehensive regulation of employee benefits, the Employee Retirement Income Security Act (ERISA). With the enactment of ERISA, Congress struck "a difficult balance between employee rights and available employer resources." *Gable v. Sweetheart Cup Co.*, 35 F.3d 851, 859 (4th Cir. 1994). "Congress accordingly rejected vesting requirements for welfare benefit plans and instead accorded employers the flexibility to make future modifications of such plans." *Id.* Here, Defendant provided a generous welfare benefits Plan for retirees and relied on its statutory right to modify and amend the Plan, while noting its understanding of that right in the written Plan documents. As the Court will explain, ERISA, and the case law this Court is bound to follow, control the claims Plaintiffs raise here.

## II. LEGAL STANDARD

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal citations and quotations omitted). It follows that a court may not issue a preliminary injunction absent "a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22

(2008). "Granting the ultimate relief requested, even temporarily, at an early point in the case, often prior to the issues even being joined in the pleadings, seems rightly reserved for only the most compelling of cases." *Dewhurst v. Century Aluminum Co.*, 731 F. Supp. 2d 506, 514 (S.D. W. Va. 2010), *aff'd*, 649 F.3d 287 (4th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that [1] he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Id.* at 20. The burden of proof rests with the party seeking a preliminary injunction, not with the party opposing its issuance. *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 445 (1974). Where a court finds that plaintiffs are not likely to succeed on the merits of their claims, such finding is dispositive of the motion for preliminary injunction, and the court need not turn to the remaining factors of the analysis. *See Dewhurst*, 731 F. Supp. 2d at 521 (finding that plaintiffs failed to show the likelihood of success on the merits and therefore denying the motion for preliminary injunction); *Dewhurst*, 648 F.3d at 293 ("The district court issued a thorough and well-reasoned opinion explaining in detail that the Retires failed to establish a likelihood of success on the merits. We agree and therefore affirm the district court's denial of the motion for a preliminary injunction.").

### III. DISCUSSION

This Court will turn to an analysis of the elements of preliminary injunction.

1. **Likelihood of success on the merits**

To have a successful claim for a preliminary injunction, Plaintiffs first have the burden of establishing that they will be likely to succeed on the merits of their claims. Plaintiffs claim that Defendants breached their fiduciary duty in violation of 29 U.S.C. § 1104(a)(1)(A)(i). *Pl.*

*Compl.* ¶¶ 79–87. Plaintiffs also claim that Defendants failed to: 1) meet their duty of disclosure with respect to SPDs, 2) provide accurate and comprehensive SPDs, and 3) provide adequate SPDs in a timely manner, in violation of 29 U.S.C. §§ 1021(a)(1), 1022(a), 1024(b)(1). *Id.* ¶¶ 92–104. Due to these violations, Plaintiffs argue that they are entitled to Plan reformation, estoppel, and surcharge as equitable relief provided for by 29 U.S.C. §§ 1132(a)(1)–(3). *Id.* ¶¶ 88–91.

The heart of this Court's analysis goes to the relief Plaintiffs request at the preliminary injunction stage—the reformation of the previous Plan, requiring Defendant revert to its previous iteration of the retiree welfare benefits Plan which required it to provide coverage, and estopping Defendants from relying on the reservation of rights language in the SPDs and Plan documents. *Pl. Compl.* ¶¶ II, III. Even assuming Plaintiffs' allegations support a finding of a breach of fiduciary duty, Plaintiffs cannot prove that they are entitled to such relief at this stage; therefore, Plaintiffs' motion for preliminary injunction must fail.

Plaintiffs rely primarily on the Supreme Court case *CIGNA Corp. v. Amara* to support their claims for equitable relief. The *Amara* Court notably held that equitable relief in the form of reformation, estoppel, and surcharge could be available to plaintiffs for violations of ERISA under 29 U.S.C. § 1132(a)(3), which allows plan participants and beneficiaries to bring a civil action to obtain "appropriate equitable relief" to address an ERISA violation.[1] *CIGNA Corp. v. Amara*, 563 U.S. 421, 438–39 (2011); 29 U.S.C. § 1132(a)(3). This "appropriate equitable relief" is generally that relief which was traditionally available in a court of equity—not in a

---

[1] The Supreme Court held that such relief *could not* be granted under 29 U.S.C. § 1132(a)(1)(B), as this provision of the statute allowed the recovery benefits due under the *terms* of the plan. Statements made to *Amara* plaintiffs *about* the plans did not constitute the *terms* of the plan for the purposes of this section; therefore, the court could not rely on this section to provide the equitable relief. *CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011). This is relevant, as here, Plaintiffs are not asserting to enforce the terms of the Plan documents. Rather, they are asserting that, due to the misrepresentations made to them by Defendant, they are entitled to the lifetime benefits that were represented to them by Defendant's staff.

court of law. *Id.* at 439. Having established the existence of the equitable remedies of plan reformation and estoppel under 29 U.S.C. 1132(a)(3), this Court next turns to an analysis of whether such remedies are available to Plaintiffs.

i. Plan Reformation

Plaintiffs assert that they are entitled to seek Plan reformation as a form of equitable relief under ERISA pursuant to 29 U.S.C. § 1132(a)(3). Reformation relief can be found following the principles of contract law or the principles of trust law. *Id.* at 443–44. On remand, the District Court in *Amara* relied on the principles of contract law in reforming the plaintiffs' pension benefit plan, not trust law. *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 251 (D. Conn. 2012) (noting how the Supreme Court discussed the availability of reformation as a remedy under 29 U.S.C. § 1132(a)(3) in terms of the principles of contract law), *aff'd* 775 F.3d 510 (2d Cir. 2014). The district court found the application of contract law principles more appropriate in the context of reforming a pension plan which arose out of an employment contract. *Id.* at 251. This distinction between trust law and contract law principles is important, as under the principles of trust law, the settlor's intent is the focus of the inquiry when reforming a plan. *See Amara v. CIGNA Corp.*, 775 F.3d at 524.

The *Amara* Court discussed how equity courts could "reform contracts to reflect the mutual understanding of the contracting parties where fraudulent suppression[s], omission[s], or insertion[s]"…"material[ly] … affect[ed] the substance of the contract, even if the complaining part[y] was negligent in not realizing its mistake, as long as its negligence did not fall below a standard of reasonable prudence and violate a legal duty." *Amara*, 563 U.S. at 443 (internal citations and quotations omitted); *Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 955 (9th Cir. 2014) ("The power to reform contracts is available only in the event of mistake or fraud.");

*Skinner v. Northrop Grumman Retirement Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012) ("[R]eformation is proper only in cases of fraud and mistake."); *Amara v. CIGNA Corp.*, 925 F. Supp. 2d 242, 252 (D. Conn. 2012) ("Equity courts traditionally had the power to reform contracts that failed to express the agreement of the parties, owing either to mutual mistake or to the fraud of one party and the mistake of the other."). Plaintiffs here can show neither mutual mistake nor fraud. Accordingly, reformation is not an appropriate equitable remedy.

Plaintiffs rely on *Amara* to support their claim for Plan reformation. The details of the pension plans and the misrepresentations made by CIGNA Corp. in *Amara* are complicated, but this Court will summarize the facts as they are relevant to this matter. *Amara* arises out of CIGNA Corp.'s change of its basic pension plan, which had originally provided retirees with a defined benefit. *Amara*, 563 U.S. 424. The original plan was replaced with an account balance plan. *Id.* CIGNA Corp. promised to convert employees' already accrued benefits under the original plan into an equivalent contribution into the employees' cash benefit account. The company guaranteed that, upon retirement, employees could get the greater value of either the benefits under the original plan or the new plan. *Id.* at 428. While the company made representations to employees that the new plan would improve their retirement benefits, the new plan actually reduced the value of several benefits, including: 1) the ability to retire early with only somewhat reduced benefits; 2) a downward adjustment of CIGNA Corp.'s initial deposit into the employees' account; and 3) the shift of the risk of falling interest rates to employees. *Id.* at 429–30. Instead of clearly identifying the differences in the plans, CIGNA Corp. intentionally misled employees about the new plan. *Id.* at 428. The company sent out a newsletter informing employees that the new plan would "significantly enhance" the program and provide an "overall improvement" of the retirement benefits. *Id.* Both representations were found to be untrue. The

newsletter also promised employees that their benefits would grow yearly—in reality, the new plan saved CIGNA Corp. $10 million a year and did not fully compensate employees for the benefits they had already earned under the original plan. *Id.* at 429. CIGNA Corp. did not inform employees about the new features of the plan and actively kept this information from employees. *Id.* at 431. This conduct served as the basis for reformation.

The matter before this Court differs significantly from that of *Amara*. First, *Amara* involved a dispute over statutorily vested benefits flowing from a pension plan. Here, the dispute involves an unvested welfare benefits Plan. *See Gable*, 35 F.3d at 855 ("Although ERISA contains a strict vesting requirement for pension benefits, it expressly exempts employee welfare benefit plans from that requirement… Accordingly, a plan participant's interest in welfare benefits is not automatically vested."). ERISA makes it difficult to change, amend, or terminate benefits that have vested. In contrast, the statute explicitly allows for the modification of unvested welfare benefits. *Id.* ([E]mployers have a statutory right to amend the terms of the plan or terminate it entirely. (internal citations omitted)). Plaintiffs in *Amara* had an existing right to the benefits under the original plan which was curtailed by the new plan. Similarly, the plaintiffs in *Osberg v. Foot Locker*, which Plaintiffs here cite to to support their claim for reformation, had a statutorily vested interest in the pension benefits that were reduced by the implementation of a new pension plan. 862 F.3d 198, 202 (2d Cir. 2017). Plaintiffs here have no statutory right to the benefits provided under the previous welfare benefits Plan.

Plaintiffs also misplace reliance on *Int'l Union v. CONSOL Energy, Inc.*[2] In *Int'l Union*, the plaintiffs had a vested interest in benefits that were the product of a collective bargaining agreement. Plaintiffs rely on Judge Faber's finding that the switch from a retiree welfare

---

[2] It is significant to note that *Int'l Union v. CONSOL Energy* did not arise out of a claim for an ERISA violation—this case arose out of a labor contract dispute. *See Int'l Union v. CONSOL Energy*, 243 F.Supp.3d 755, 762 (S.D.W. Va. 2017). Neither Judge Faber's opinion nor the plaintiff's amended complaint references ERISA.

benefits plan to a health reimbursement account shifted the administrative burdens and risks from the defendants to plaintiffs. *Int'l Union v. CONSOL Energy, Inc.*, 243 F. Supp. 3d 755, 767 (S.D.W. Va. 2017). However, because this was a union collective bargaining agreement, plaintiffs and defendants had already contracted to that risk being borne by defendants. The *Int'l Union* plaintiffs' benefits and rights were vested, entitling them to those benefits that were the product of the collective bargaining agreement.

Plaintiffs' benefits here are not vested, and thus they are not entitled to the benefits of the previous Plan. Instead, the benefit Plan that Plaintiffs seek to reform is governed by ERISA's well-established preference for written plan documents. *Gable v. Sweetheart Cup Co.*, 35 F.3d. 851, 857 (4th Cir.1994). Defendant's 501 Plan documents, 506 Plan documents, SPD, and even the 2019 open enrollment forms mailed to Plaintiffs all contained reservation of rights language, which stated that Defendant reserved the right to amend, modify, change, or terminate the Plan at any time and for any reason. *See* ECF Nos. 14-3 §§ 6.1, 6.2, 14-5 § 9.9, 23-1, 23-2, 23-3 §§ 5.1, 5.3. Informal documents or oral communications cannot override formal ERISA plan documents—in fact, ERISA expressly prohibits such modifications or amendments of benefit plans. 29 U.S.C. § 1102(b)(3); *Gable*, 35 F. 3d at 851. The oral representations made to Plaintiffs that Defendant would provide for lifetime welfare benefits cannot negate the reservation of rights language within the formal ERISA Plan. *See Gable*, 35 F.3d at 857; *see Nachwalter v. Christie*, 805 F.2d 956, 960 (11th Cir. 1986). "[O]ral representations or promises cannot modify the clear terms of an employee benefit plan." *Alday v. Container Corp. of America*, 906 F.2d 660 (11th Cir. 1990). Granting Plaintiffs' requested relief would ultimately amount to an impermissible modification of formal ERISA plan documents. *Woods v. Northrop Gruman Corp.*, 2010 WL 11564991 (E.D. Va. June 14, 2010).

Secondly, the court in *Amara* found fraudulent conduct on behalf of CIGNA Corp. The company affirmatively misrepresented the terms of the benefits under the new plan and misled employees. *Amara*, 563 U.S. at 431. Plaintiffs here do not claim, apart from conclusory and unsubstantiated assertions in the Complaint, *Pl. Compl.* ¶¶ 86, 87, 91, that Defendant has engaged in any fraudulent behavior.

Fraudulent behavior has a broader meaning at equity, and intent to defraud or misrepresent is not a necessary element. *Pearce v. Chrysler Group LLC Pension Plan*, 893 F.3d 339, 348 (6th Cir. 2018) (citing *SEC v. Capital Gains Research Bureau, Inc*. 375 U.S. 180, 193 (1963). "Fraud ... in the sense of a court of equity properly includes all acts, omissions and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another, or by which an undue and unconscientious advantage is taken of another." *Capital Gains Research Bureau, Inc.* 375 U.S. at 194 (footnote and internal quotation marks omitted); *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 557 (S.D.N.Y. 2015) ("Fraud 'generally consists of obtaining an undue advantage by means of some act or omission which is unconscientious or a violation of good faith.'") (quoting *Amara v. CIGNA Corp.*, 775 F.3d 510, 526 (2d Cir. 2014)).

The Sixth Circuit has held that the factors to be considered in a fraud consideration at equity include: 1) the existence of a legal or equitable duty, trust, or confidence; and 2) undue and unconscientious advantage to the defendant or injury to the plaintiff. *Pearce*, 893 F.3d at 348 (citing *Capital Gains*, 375 U.S. at 194). These principles were established relying on the fraud element of equitable estoppel. *Id.* Constructive fraud can be found in the context of ERISA when 1) there is "an information asymmetry such that the defendant is the only one who knows the true facts and the plaintiff cannot ascertain the true facts"; 2) "the defendant misrepresents

the benefits to which the plaintiff is entitled"; and 3) "the plaintiff investigated her benefits and drew a reasonable conclusion about them on the basis of the defendant's misrepresentations, even when the documents the plaintiff relied upon contained a disclaimer that the plan would govern in the event of a conflict." *Id.* at 349. There must be clear and convincing evidence to establish fraud. *Id.* at 347.

Plaintiffs here cannot satisfy any elements of the fraud analysis in the ERISA context. First, there existed no such information asymmetry such that Plaintiffs had no access to the Plan documents which contained the reservation of rights language. Although it seems from the parties' briefing and from the testimony at the hearing held on September 23, 2021, that Defendant failed to distribute SPDs to Plan participants and beneficiaries as required by statute, failure to distribute these documents alone does not constitute fraud.[3] In fact, according to Becky Wells testimony at the hearing, she informed Plaintiffs that the welfare plan was readily available for Plaintiffs' review online. This differs significantly from *Pearce*, where the plaintiff had no access to plan documents at all, and instead relied on a misleading SPD for information about his vested benefits plan. *Id.* at 349. This also differs from *Osberg*, where facts about the nature of the change in benefits under the newly instituted pension plan were deliberately left out of communications and the SPDs distributed to plan participants. *Osberg*, 862, F.3d at 204.

Additionally, the 2019 open enrollment forms that were mailed to the Plaintiffs included the reservation of rights language plainly. Plaintiffs had access to the plan documents which presented to plaintiffs in clear language the fact that Defendant reserved the right to amend, modify, or terminate the plan at any time. *See Haviland v. Metropolitan Life Ins. Co.*, 730 F.3d 563, 566, 569 (6th Cir. 2013). Further, from the testimony at the hearing, it appears that

---

[3] *Compare Pearce v. Chrysler Group LLC Pension Plan*, 893 F.3d 339, 349 (6th Cir. 2018) (discussing how the distribution of SPDs that misleadingly omitted exclusionary policy language was fraudulent behavior).

Plaintiffs were aware of previous amendments to their welfare benefits, so Plaintiffs had notice of Defendant's ability to amend or modify the Plan.[4]

Second, no misrepresentations were made to Plaintiffs regarding benefits that they were *entitled* to at the time. As previously mentioned by this Court, the benefits at issue here are unvested welfare benefits that are subject to amendment. Under the Plan, Plaintiffs had no entitlement to the lifetime benefits. And, even though Ms. Wells had represented to Plaintiffs that the welfare benefits were "lifetime benefits," according to the testimony of April Stanley, once she, as a supervisor in the Human Resources department, learned of these oral representations, she immediately corrected Ms. Wells and informed her to stop referring to the welfare benefits as "lifetime benefits."

Lastly, Plaintiffs point to no evidence that any written Plan description misled them, nor do they contradict Defendant's evidence that the Plans were posted online, and that Plaintiffs were so informed.

Because Plaintiffs have not claimed—nor can they satisfy the elements for—fraud, and there is no existence of a mutual mistake of understanding, Plan reformation is not an available remedy in equity.

    ii.    <u>Estoppel</u>

Next, Plaintiffs assert they are entitled to estoppel to prevent Defendant from relying on the reservation of rights language found in the 506 Plan due to Defendant's failure to properly distribute SPDs. "When a court exercises its authority under [29 U.S.C. § 1132(a)(3)] to impose a remedy equivalent to estoppel, a showing of detrimental reliance must be made." *Amara*, 563 U.S. at 443; *see Gable*, 35 F.3d at 859. A successful claim for equitable estoppel must establish: 1) "conduct or language amounting to a representation of material fact;" 2) "awareness of the

---

[4] Witnesses testified that copays, deductibles, and other terms of the plan were changed from time to time.

true facts by the party to be estopped;" 3) "an intention on the part of the party to be estopped that the representation be acted on, or conduct toward the party asserting the estoppel such that the latter has a right to believe that the former's conduct is so intended;" 4) "unawareness of the true facts by the party asserting the estoppel;" and 5) "detrimental and justifiable reliance by the party asserting estoppel on the representation." *Pearce*, 893 F.3d at 349–50 (citing *Deschamps v. Bridgestone Americas, Inc. Salaried Emps. Ret. Plan*, 840 F.3d 267, 273 (6th Cir. 2016). Additionally, when plaintiffs attempt to estop unambiguous plan provisions, three additional elements must be met: 1) a written representation; 2) plan provisions that, although unambiguous, did not allow for an individual to understand or calculate their benefits; and 3) extraordinary circumstances that lead the balance of the equities to strongly favor estoppel. *Id.* at 350; *Deschamps,* 840 F.3d at 273.

This Court finds that Plaintiffs cannot meet the first additional factor requiring them to point to a written representation. Plaintiffs here have only relied on the oral representations made to them regarding the nature of their benefits. There is no written promise Plaintiffs can point to that can support their claim.

This Court also finds that Plaintiffs cannot meet the second additional factor requiring them to point to Plan language that, although unambiguous, does not allow them to understand the nature of their benefits. The Plan provision at issue here is the reservation of rights language. This language, found in the 506 Plan, states: "Cabell Huntington Hospital, Inc. reserves the right to amend the Plan and any Component Benefit Plan from time to time in its sole discretion, including amendments that are retroactive in effect to the extent permitted by law." ECF No. 23-3 § 5.1. The Plan also states: "Cabell Huntington Hospital, Inc. may terminate the Plan and any Component Benefit Plan in whole or in part at any time in its sole discretion." *Id.* at § 5.3. This

language is clear. Defendant expressly reserved its right to amend and terminate the Plan at any time, and the Plan language which conveys this information does so clearly and plainly. A Plan participant would be well appraised of the meaning of these Plan provisions. *See Sprague v. General Motors Corp.*, 113 F.3d 388, 404 (6th Cir. 1998) ("[E]stoppel can only be invoked in the context of ambiguous plan provisions."); *id.* ("In the face of GM's clearly-stated right to amend—a right contained in the plain to which the plaintiffs had access and in many of the summaries they were given—reliance on statements allegedly suggesting the contrary was not, and could not be, reasonable or justifiable, especially when GM never told the plaintiffs that their benefits were vested or fully paid-up.").

The Sixth Circuit in *Pearce* held similarly, that, while SPD language made it seem like that plaintiff would be eligible for certain benefits, the language of the *actual plan* made it quite clear that the plaintiff was ineligible for the benefits he was seeking. *Id.* In fact, the Sixth Circuit has held that language in a "plan document stating that the employer 'reserves the right to amend, modify, suspend or terminate the [Plan] in whole or in part, at any time' was sufficiently accessible to the beneficiaries such that they should have been able to determine that their… benefits were subject to modification at any point." *Pearce*, 893 F.3d at 351 (citing *Halivand*, 730 F.3d at 556, 559). It would be "unreasonable" for Plaintiffs to "recover under an estoppel theory for misrepresentations which contradict unambiguous, written plan terms because their reliance on the subsequent representation would be unreasonable." *American 1 Credit Union v. Puckett*, 2020 WL 2836308, No. 19-11943 at \*7 (E.D. Mich. May 31, 2020) (citing *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416. 429 (6th Cir. 2006)); *Sprague*, 113 F.3d at 404 ("That party's reliance can seldom, if ever, be reasonable or justifiable if it is inconsistent with the clear and unambiguous terms of plan documents available to or furnished to the parties.").

Even if Plaintiffs were able to demonstrate that they detrimentally relied on Defendant's representations regarding the "lifetime benefits," the fact that Plaintiffs cannot establish the other necessary elements under an equitable estoppel analysis is dispositive on the issue. Therefore, the remedy of equitable estoppel is likewise inappropriate here.

iii.  Surcharge

While Plaintiffs note that they are entitled to surcharges, and Defendant argues they are not, such discussion is inappropriate at the preliminary injunction stage. As noted in *Amara*, surcharge can be an equitable remedy under 29 U.S.C. § 1132 for a violation of ERISA, but such monetary remedy is not granted at the preliminary injunction stage. In fact, it is notable that surcharge could be the remedy this court ultimately provides for Plaintiffs if they are successful at later stages of litigation. This reality is indicative of inappropriateness of injunctive relief at this stage, as Plaintiffs may be compensated by an award of damages.

Plaintiffs cannot demonstrate that they are entitled to the relief they seek at this stage. Thus, their claims must fail on the merits, and this Court need not evaluate the merits of the other individual claims.

**2. Irreparable harm, balance of the equities, public interest**

Because Plaintiffs cannot prove they are entitled to the remedies of plan reformation or estoppel, this Court need not discuss the remaining elements of a preliminary injunction claim. *See Dewhurst*, 731 F. Supp. 2d at 521 (finding that, because plaintiffs cannot satisfy their burden to demonstrate that they likely to succeed on the merits of their claim, plaintiff's motion for preliminary injunction should be denied).

### IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' Motion.  ECF No. 10.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented parties.

ENTER: October 8, 2021

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE