**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

**MARTHA BLENKO,
LAURA MULLARKY, and
JANE DOE, individually
and on behalf of all others similarly situated,**

      **Plaintiffs,**

**v.**                                     **CIVIL ACTION NO. 3:21-cv-00315
Honorable Judge Robert C. Chambers**

**CABELL HUNTINGTON HOSPITAL, INC.,**

      **Defendant.**

## ORDER APPROVING FINAL SETTLEMENT AND NOTICE

Plaintiffs and Defendant (the "Parties") have moved this Court, pursuant to Rules 23 and 54(d)(2) of the *Federal Rules of Civil Procedure*, to certify the class for settlement purposes. The settlement in this matter, totaling $5,694,500.00, was reached by the Parties pursuant to a Mediation Agreement on May 24, 2022, an Addendum on July 7, 2022, and as set forth more fully herein. The Court preliminary approved the settlement and certified the class on August 10, 2022. On October 31, 2022, the Court held a fairness hearing to consider final approval of the settlement. The Court has separately reviewed the Motion to Establish a Qualified Settlement Fund and Appoint Fund Administrator and Trustee.

As set forth below, the Court FINDS that the terms of the settlement are fair and adequate for the class, the settlement is otherwise proper under Rule 23 and other applicable rules as set forth below. As set forth herein, the Court finally APPROVES the settlement and the Notice of Final Settlement.

1

## I.      LEGAL STANDARD

### A.      Class Certification

Motions for class certification in federal courts are adjudicated under Rule 23(a), (b).  To merit class certification, the class must satisfy the four prerequisites under Rule 23(a): numerosity, commonality, typicality, and adequacy. (*See generally* Mem. in Supp. of Mot. for Class Cert., ECF Doc. # 13.)

The class must also satisfy one of the bases for certification under Rule 23(b).  *See id.* Here, the class is appropriate for certification under Rule 23(b)(3).  Rule 23(b)(3) provides for certification when questions of law or fact common to the members of the class predominate over purely individual questions.

### B.      Class Settlement

Rule 23(e) provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." Fed. R. Civ. P. 23(e). "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. . . The court cannot accept a settlement that the proponents have not shown to be *fair, reasonable and adequate*." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir. 1975) (emphasis added) (citations omitted); *see also Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir.1983); *Sala v. National RR Passenger Corp.*, 721 F. Supp. 80 (E.D. Pa.1989) *Piambino v. Bailey*, 610 F.2d 1306 (5th Cir. 1994).

An initial presumption of fairness of a class settlement may be established by showing:

1.  That the settlement has been arrived at by arm's-length bargaining;
2.  That sufficient discovery has been taken or investigation completed to enable counsel and the court to act intelligently;
3.  That the proponents of the settlement are counsel experienced in similar litigation; and

2

4. That the number of objectors or interests they represent is not large when compared to the class as a whole.

*See e.g. In re General Motors Corp. Pick-up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 785 (3d Cir. 1995).

**C.    Class Notice**

Rule 23(c) provides for distinct forms of notice for classes certified under (b)(3).  Fed. R. Civ. P. 23(c). For classes certified under (b)(3), the rule provides for mandatory notice so that class members may opt out of the settlement.

Rule 23(e) governs notice of the settlement of a class action. Rule 23(e) requires that the Court must direct notice of a proposed class action settlement "in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e).

**D.    Attorney Fees**

Rule 23(h) provides that, in a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement.

## II.    DISCUSSION

**A.    Class Certification for Settlement Purposes is Appropriate under Rule 23(b)(3) because Classwide Settlement Provides Uniform Resolution to Common Claims Regarding a Single Dispute about a Single Retiree Healthcare Benefit Plan.**

The issues in this case involve a single dispute about a single retiree healthcare benefit plan. The Court incorporates by reference its extensive discussion of Rule 23 and the terms of this settlement in its Memorandum and Order entered on August 10, 2022. (ECF Doc. # 64.)

To be certified, a class must satisfy the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a);

*Amchem v. Windsor*, 521 U.S. 591, 620 (1997); *In re Community Bank of Northern Virginia*, 418

F.3d 277, 300 (3rd Cir. 2005). In addition, the class must satisfy the requirements of Rule 23(b)(1),

(2), or (3). In these cases, the Parties have agreed to request conditional certification under Rule

23(b)(3), "the customary vehicle for damage actions." *Id.*

In order to certify a class under Rule 23(b)(3), the court must make two findings:

predominance and superiority. That is, "[i]ssues common to the class must predominate over

individual issues, and the class action device must be superior to other means of handling the

litigation." *Gates v. Rohm & Hass Co.*, 248 F.R.D. 434, 442-43 (E.D. Pa 2008).

**B.**   **Findings of Fact and Conclusions of Law.**

    **1)   Settlement: The Settlement Is Fair to the Class and Class Counsel Will Provide Adequate Notice.**

Rule 23(e) provides that a court may approve a binding class settlement only after a hearing

and only on finding that it is fair, reasonable, and adequate after considering whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3)[Mediation Agreement]; and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e).

The Court approves the proposed settlement because the terms are fair to the class, and

because the representatives have proposed an effective framework for providing the class with

notice and an opportunity to object or opt out of the settlement.

a) <u>**Fairness**</u>: **Terms of the settlement are fair to the class because the parties mediated at arm's length with Magistrate Judge Eifert; the Plaintiffs completed class discovery; class counsel are experienced in similar litigation; and the number of objectors is anticipated to be minimal.**

A presumption of fairness may be invoked by the parties to a class action settlement upon an adequate showing of the four factors set forth in Rule 23(e)(A)-(D). *See In re General Motors Corp.*, 55 F.3d at 783. First, the Plaintiffs and counsel have aggressively represented the class, having promptly developed the facts and legal argument in the initial stages of this case, presenting a robust evidentiary and testimonial record in support of the initial motion to certify a class and motion for preliminary injunction. (ECF Doc. #30, Order Granting Injunction; ECF Doc. # 10, Mot. for Prelim. Inj.; ECF Doc. ##12, 13, Mot. to Cert. Class & Mem. in Supp.) Second, the parties mediated at arms' length via an independent mediator, the Honorable Magistrate Judge Cheryl Eifert, on March 16, 2022. (ECF Doc. # 59.)

Third and fourth, the relief provided for in the settlement is adequate and fair for the class and treats class members equitably relative to each other.

The terms of the Mediated Settlement Agreement are as follows:

1) The Defendant agrees to pay $5,694,500.00 into a qualified settlement fund subject to and consistent with this Mediation Agreement (hereinafter referred to as "Agreement"), including class representative service fees as described in Paragraph 2 below, administration fees set as described in Paragraph 3 below, a High Risk Fund, as described in Paragraph 4, with the remainder to comprise a Common Fund, as described in Paragraph 5.

2) **Service Fees for Class Representatives.** From the sum set forth in Paragraph 1, the Parties agree that $15,000.00 will be paid apiece to each of the three class representatives as a class representative service fee, for a total of $45,000.00.

3) **Administrative Fees for Class Action Settlement.** From the sum set forth in Paragraph 1, the Parties agree that up to $175,000.00 may be paid to a Settlement Administrator (hereinafter referred to as "Settlement Administrator") for services associated with administration of the class and settlement funds.

4) **High Risk Fund.** From the sum set forth in Paragraph 1, $500,000.00 shall be allocated to a High Risk Fund, maintained and administered by the Settlement Administrator, for the

payment of expenses qualified for payment by a health reimbursement account as to which class members have submitted the expense to both a Medicare Part B and Part D supplement and received a denial of part or all payment.

5) **Common Fund.** After making the foregoing allocations, the remainder of the sums in the qualified settlement fund comprise a Common Fund.

    a) **Contingent Fee.** From the Common Fund, twenty percent (20%) shall be allocated as a reasonable contingent fee to the Class Counsel, as defined in Paragraph 7 below.

    b) **Pro Rata Distribution.** After the payment of the contingent fee, the remainder of the Common Fund shall be allocated in equal shares (the "Pro Rata Distributions") for each member of the class into health reimbursement accounts, such accounts maintained by the Settlement Administrator and/or the individual class members (or either the Settlement Administrator's or the individual class members' designees), for costs and expenses qualified for payment by such an account.

    c) **Reversion.** If more than 21 members of the class opt out of the settlement, the Common Fund shall be reduced by an amount equivalent to 0.65 multiplied by the number of class members in excess of 21 that opted out multiplied by the per capita Pro Rata Distribution of the Common Fund that would otherwise have been payable to 211 class members. Defendant shall be allowed to reduce the amount of its payments to the qualified settlement fund by any reversion amount determined under this Paragraph 5(c).

6) **No Side Settlements.** Defendant agrees not to solicit or enter any settlement agreement with class members regarding retiree healthcare benefits outside of this Agreement prior to the closure of any opt-out period set forth by the United States District Court.

7) **Class Certification and Class Counsel.** The Parties agree to the certification of a class of 211 retirees as specified in the Class List attached to this Agreement, and to the appointment of Bren Pomponio and Laura Davidson of Mountain State Justice, Inc., and Samuel B. Petsonk of Petsonk PLLC as Class Counsel.

8) **Contingent Fee.** The Defendant does not contest the payment of a reasonable contingent fee to the Class Counsel in the amount of 20% percent of the Common Fund.

9) **Payment into qualified settlement fund.** Consistent with the terms of this Agreement, the Defendant shall pay the sum set forth in this Agreement into a qualified settlement fund and those payments shall be allocated by the Settlement Administrator to their respective purposes according to this Agreement. Payment into the qualified settlement fund shall be made by the Defendant within 90 days after the end of the opt-out period, the approval of class certification, or the final approval of the settlement by the United States District Court, whichever occurs last.

10) **Coverage Termination by Defendant.** Class members who have not yet reached the age of Medicare eligibility shall continue to be eligible to receive the same coverage offered to non-union employees under Defendant's medical benefit program (and will be responsible for paying applicable premiums) until reaching the age of Medicare eligibility or, for those who

have reached such age (the "Medicare-eligible" class members), until midnight on the date by which all of the following have occurred: (1) the end of the class opt out period; (2) the United States District Court's approval of the settlement; and (3) the funding of the qualified settlement fund (the "Coverage Termination Date"). Participants who are Medicare-eligible class members shall be entitled to the reimbursement of eligible medical benefits claims incurred on or before the Coverage Termination Date, provided such claims are properly submitted in accordance with the terms of Defendant's current medical benefits program within sixty (60) days of the Coverage Termination Date. Claims submitted by Medicare-eligible class members after the claims submission deadline (as described in the preceding sentence), regardless of when they were incurred, shall not be eligible for reimbursement under Defendant's medical benefits program. In addition, no claims incurred by Medicare-eligible class members after the Coverage Termination Date shall be eligible for reimbursement under Defendant's medical benefits program. After the funding of the qualified settlement fund, the Defendant shall have no further obligation or responsibility for health benefits for the Medicare-eligible class members.

11) **Recommendation.** Paul English Smith, Vice President and General Counsel of the Defendant, will recommend this Agreement for adoption by the Board of Directors.

12) **Approvals.** This Agreement is subject to two approvals: the Board of Directors of Cabell Huntington Hospital, Inc. and the Honorable Robert C. Chambers, United States District Judge, pursuant to the dictates of Federal Rule of Civil Procedure 23 governing class actions.

13) **Distribution of Funds.** Upon final approval of the settlement by the United States District Court after appropriate process, the Class Counsel shall notify the Settlement Administrator to commence distribution of all sums in accordance with these agreed-upon terms.

14) **Media Statement.** Upon approval of the settlement by the United States District Court, representatives of the Defendant and Class Counsel shall issue a joint media statement regarding resolution of the case.

15) **No Admission.** None of this Agreement itself constitutes any admission by any of the Parties of any liability, wrongdoing or violation of law, damages, or the validity or invalidity of any claim or defense asserted in the pending litigation. If the United States District Court does not approve the settlement, all negotiations, proceedings, and documents prepared, and statements made in connection therewith, shall remain confidential except that this Agreement shall remain as an exhibit to the Plaintiff's Motion to Certify the Class, and except as determined otherwise by the United States District Court, and shall be without prejudice to any Party and shall not be deemed or construed to be an admission, and the Parties shall stand in the same procedural position as if the Agreement had not been negotiated or made.

16) **Dismissal.**

a.     **Class Release of Claims for Termination of Retiree Healthcare Benefits.** As part of the settlement presented for approval by the United States District Court, Plaintiffs shall execute a release of claims against Defendant related to the Cabell Huntington Hospital Inc.

Employee Health and Welfare Benefit Plan (the "506 Plan") and any predecessor version, including the Cabell Huntington Hospital, Inc. Employee Health Plan (the "501 Plan"), and claims related to life insurance benefits under any such plans, ("Released Claims") to fully and completely settle, release, and forever discharge Defendant (hereinafter "Defendant," including its predecessors, successors, affiliates, officers, directors, employees, consultants, representatives, attorneys, insurers, reinsurers, agents, and assigns) from any and all past, present and future Released Claims, and potential claims, demands, obligations, damages, actions, assessments, liabilities, fines, losses, judgments, costs, fees, bills, expenses (including without limitation, all legal fees, interest and penalties), suits, at law or in equity, and causes of action of whatsoever kind or nature, whether known or unknown, which are now existing, or which might arise after the Coverage Termination Date, for the Released Claims under the Employee Retirement Income Security Act of 1974 (ERISA), as amended, and all private and other causes of action that arise for the Released Claims under contract, common law, negligence (including but not limited to the negligence of Defendant's employees, agents, and/or independent contractors), and other expenses or damages, incurred or to be incurred that arise, with respect to the class, that are based upon the Defendant's curtailment or termination of retiree benefits described above; *provided that*, notwithstanding the foregoing, nothing in this agreement encumbers or releases any claim regarding life insurance arising out of the acts or omissions of any entity other than Cabell Huntington Hospital, Inc. This paragraph comprises a classwide release of claims as defined above.

      **b.**     **Individual Releases.** Additionally, only with respect to Martha Blenko, Laura Mullarky, and Jane Doe, those persons in their individual capacity, and not on behalf of the class, shall execute a release of the personal claims that they may now possess arising from the Plaintiffs' employment with the Defendant, including, but not limited to, breach of contract, express and implied; intentional or negligent infliction of emotional distress; negligence; defamation; outrage; unlawful discrimination; violations of West Virginia public policy (commonly referred to as "*Harless*" claims. *See Harless v. First Nat'l Bank of Fairmont*, 246 S.E.2d 270 (W.Va. 1978)); the Americans with Disabilities Act; the West Virginia Human Rights Act; the West Virginia Patient Safety Act; the Civil Rights Act of 1964; and the Age Discrimination in Employment Act. Blenko, Mullarky, and Doe acknowledge and agree that the receipt of the settlement proceeds in this case represents good and valuable consideration for the release of their individual employment claims against Defendant.

      **c.**     **Scope**. Notwithstanding the foregoing, this release does not encompass conduct that arises between the entry of this release and the Coverage Termination Date. Provided further that, for the avoidance of doubt, if the settlement is not approved by the District Court, the releases set forth in this Agreement, and this Agreement in its entirety, are also null and void.

(ECF Doc. # 62-1) (Mediated Settlement Agreement) (May 24, 2022).

      **i.**     **Structure of the Settlement**

      The settlement is structured to provide a Health Reimbursement Arrangement for class

members that is designed to last for a period of at least six years, and also within that HRA to

create a High-Risk Fund to replicate the last-dollar or "Cadillac" Medicare supplement that the

Defendant provided to its retirees. By offering the High-Risk Fund, the class members have the

option to recover funds to pay for significant pharmaceutical costs that are not covered by their

Medicare supplement, such as costs of specialty drugs or items that fall within the "donut hole."

Beyond the terms set forth in the Mediation Agreement, the Parties agree to these additional

terms for the settlement of this Matter:

1. The High-Risk Fund only provides for expenses that are: a) covered under Medicare Part D (i.e. pharmaceutical), b) incurred for the treatment of a class member, and c) not paid for by class member's Part D Plan.  When submitting expenses for reimbursement from the High-Risk Fund, a class member must have a Part D plan, must submit the bill to the settlement administrator along with an explanation of benefits, or other proof of rejection of coverage by the class member's Part D plan.
2. The High-Risk Fund carries a per capita lifetime cap of $10,000.00 per class member.
3. If any funds allocated to an individual under the HRA remain unspent upon the death of that individual, such sums will be retained for the High-Risk Fund following the death of each such individual and the full payment of covered costs to the estate of the deceased for all such costs that were incurred prior to the individual's death.
4. Individual HRA allocations may be used for any expense covered by Medicare Part B or D (so-called "213(d)" expenses). Individual allocations may be used for medical, dental, vision, hearing aids, or pharmaceutical costs for the treatment of a class member, their spouse, or dependents.

(ECF Doc. # 62-2) (Addendum to Mediated Settlement Agreement) (July 7, 2022).

Plaintiffs' counsel secured a settlement services vendor, Walters Administration, to review

bids for providing the Health Reimbursement Arrangement (HRA) and to administer the

settlement including HRA and its High-Risk Fund that is part of, and augments the individually

allocated benefits, under the HRA. The bid that was most favorable to the Plaintiffs was from

Wesbanco Bank and Insurance Services (WBIS), totaling $175,000.00 to be apportioned to

Walters Administration and WBIS. This arrangement entails a one-time fee, without any

subsequent "trailing fees" that come out of any class members accounts. Wesbanco Bank will be

9

the place holder of all accounts. They will also administer reimbursements along with Walters Administration, the class administrator and third-party contract administrator of the HRA plan under this settlement. Chris Walters of Walters Administration will be a co-signer on all accounts at Wesbanco and will approve all payments. Reimbursements for expenses submitted to the settlement accounts will be released on a weekly basis by Wesbanco. The class members will have withdrawal power from any of their accounts for approved reimbursements for covered medical expenses.

The three Class Representatives would receive service fees of $15,000.00 apiece under the proposed settlement. Incentive or service payment awards to Class Representatives are "particularly appropriate in the employment context . . . [where] the plaintiff is often a former or current employee of the defendant, and thus, by lending his name to the litigation, he has, for the benefit of the class as a whole, undertaken the risk of adverse actions by the employer or co-workers." *Silberblatt v. Morgan Stanley*, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007) ("A class representative who has been exposed to a demonstrable risk of employer retaliation or whose future employability has been impaired may be worthy of receiving an additional payment, lest others be dissuaded"). In this case, the Class Representatives performed important services for the benefit of the Class by commencing the litigation and willingly assisting counsel throughout the litigation.

The amount of the service award agreed to in these cases is also consistent and on scale with amounts awarded in similar employment class actions across the country. *See D'Amico, et al. v. Tweeter, OPCO, LLC and Schultze Asset Management, LLC*, Adv. Pro. No. 08-51800 (Del. Bankr. 2008)(one class representative who was deposed received $15,000, the other two received $10,000 each. Service payments were approximately 3% of common fund); *Kettell v. Bill Heard*

10

*Enterprises, Inc.*, Adv. Pro. No. 08-80153 (N.D. Ala. Bankr. 2008) (court approved service payments for two class representatives in the amount of $10,000 each. Service payments were approximately 1% of common fund); *Kohlstadt, et al, v. Solyndra*, Adv. Pro. No. 11-53155 (Del. Bankr. 2011) (class representatives received $7,500 and $12,500, respectively, as service payments, which were approximately 0.6% of common fund); *Capizzi, et al., v. AWTR Liquidation Inc., f/k/a Rhythm and Hues, Inc.*, Adv. Pro. No. 2:13-ap-01209-NB (C.D. Cal. Bankr. 2013) (class representatives received $10,000 each as service payments, which were approximately 2% of the common fund).

Here, the service payments of $15,000.00 collectively comprise $45,000.00, which is less than .8% of the Common Fund. The class representatives have also released certain individual claims, on behalf of themselves only and not the class, against the Defendant. Accordingly, the proposed service payments are appropriate and fair.

Any amounts remaining unclaimed following the distribution of the settlement will be disbursed according to the following *cy pres* distribution: 1/3 to the Cabell Huntington Hospital Foundation; 1/3 to the Cabell Huntington Hospital Foundation for the benefit of the Cabell Huntington Hospital Outpatient Pediatric Rehab Center; and 1/3 to the American Cancer Society.

**ii.    Settlement Represents Strong Value for the Class by Providing Sufficient Funding for Over Six Years of Medicare Supplemental Benefits, and Providing Last-Dollar Coverage to Mitigate the "Donut Hole."**

During the litigation, the parties investigated the number of eligible class members. The Defendant produced documentation supporting the list of 211. Only one of those class members opted out, freely releasing their claim on the settlement. No objections were received. The Plaintiffs investigated potential claims to class membership for roughly twelve additional individuals, as to which the Parties have been able to satisfy themselves and the putative class

members that the figure of 211 is an accurate and fair assessment of the universe of eligible retirees who were affected by the challenged actions involving the retiree benefit plan.

The value secured for the class under the settlement equals $5,474,500.00 after paying the service and administration fees. Accordingly, the proposed attorney's fee award of $994,899.20 represents approximately eighteen percent (18%) of the total settlement value for the class. The attorney fee is proposed to constitute twenty percent (20%) of the sums remaining after reserving the $500,000.00 for the High-Risk Fund. The attorney fee will be fully earned and distributed at the time that the settlement is fully funded by Defendant.

The remaining Common Fund, after separating all fees, would constitute $3,979,600.80. Divided equally among the final two hundred ten (210) class members, this yields $18,950.48 per class member on a tax-free basis. Without the settlement, the class members are generally receiving $250/month in an HRA from CHH, or $3,000.00 annually---subject to the Defendant's asserted right to terminate all such payments at any time. Accordingly, the *per capita* settlement amount represents over six years of future benefits at that current rate, in addition to providing the substantial benefit of the last-dollar coverage offered through the High-Risk Fund, which is absent from the benefits that the class is currently receiving. Due to the $2,000.00 out-of-pocket cap on prescription drug costs enacted by the Inflation Reduction Act of 2022, the High-Risk coverage in this settlement is apt to provide substantially more robust protection.

The Court FINDS that the settlement creates a Health Reimbursement Arrangement for the 210 retirees that is solely funded by those class members' former employer, is solely usable for the reimbursement of medical expenses of the former employees and their spouses and dependents, not paid for directly or indirectly from salary reduction, and further FINDS that no amounts in the HRA may ever be used for anything but reimbursements for qualified medical expenses. *See* Rev.

Rul. 2002–41, page 75. This HRA, including its High-Risk Fund, satisfies the criteria of the Internal Revenue Service for favorable tax treatment as a retiree HRA. *Id.* The Court further FINDS that the High Risk Fund is part of the Defendant former employer's funding mechanism for the HRA, and that if a retiree becomes eligible for reimbursement from the High Risk Fund, such reimbursement happens with funds from the employer that are made available to the retiree through his or her HRA, and that the Defendant agrees that funds are allocated to such retiree's HRA from the funds directly allocated by the employer for the benefit of such retiree for qualified expenses under the terms of this settlement.

Due to this strong settlement result that was achieved in an efficient and timely manner without protracted litigation, the Court believes the proposed fee award is reasonable and congruent with the degree of success achieved for the class. Additionally, the associated degrees of risk and potential gain are outweighed by the benefit of securing this certain, classwide resolution in the proposed settlement.

### iii. Class Action Fairness Act: Notice and Finality.

Pursuant to the Class Action Fairness Act (CAFA), the Court orders that the Defendant notify the appropriate state and federal officials so as to provide 90 days for review before the settlement becomes final. 28 U.S.C. § 1715. Upon the elapse of 90 days following entry of this Order, and absent an objection from state or federal authorities, the settlement shall become finally approved. The Defendant has agreed to make payment of the settlement within 90 days of the date of this Order. The Court accordingly FINDS that Defendant's compliance with CAFA is satisfactory.

b) **Notice: The Proposed Notice sufficiently informs the class that the Court has approved the final settlement agreement and outlines steps for retrieving and utilizing the settlement proceeds.**

13

The Plaintiffs propose to issue a Notice of Final Approval of Class Action Settlement by U.S. Mail to all final 210 class members, and through other individualized contact as may be necessary to reach all class members. The proposed Summary Plan Description (SPD) setting forth the terms and procedures for class members to secure their individual allocations and High-Risk reimbursements under the HRA Plan is attached to the Notice. This Notice, inclusive of the attached SPD, sufficiently informs the class members of the Court's final approval of the settlement, and the procedures for receiving the benefits of the HRA settlement.

### III.    CONCLUSION

For the foregoing reasons and others appearing to the Court, the Court here ORDERS:

1) The settlement shall be finally approved as set forth in this Order;

2) The proposed Notice of Final Approval of Class Action Settlement is approved and class counsel shall cause it to issue by U.S. Mail to the 210 final class members.

ENTER: 11/2/22

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

**Prepared by:**

   */s/ Samuel B. Petsonk*
Samuel B. Petsonk (State Bar ID No. 12418)
Petsonk PLLC
PO Box 1045
Beckley, WV 25802
(304) 900-3171 (phone)
(304) 986-4633 (fax)
sam@petsonk.com

Bren J. Pomponio (WVSB #7774)
Laura Davidson (WVSB #13832)
Mountain State Justice, Inc.
1217 Quarrier Street, Suite
Charleston, West Virginia 25301
(304) 344-3144
(304) 344-3145 (fax)
bren@msjlaw.org
laura@msjla.org
*Counsel for Plaintiffs*

**Reviewed by:**

**Cabell Huntington Hospital, Inc.**
**By counsel,**

*/s/ David S. Amsbary*
David D. Amsbary (W. Va. Bar No. 9968)
Melissa Eakle Leasure (W. Va. Bar No. 10327)
Bailes, Craig, Yon & Sellards, PLLC
401 10th Street, #500
Huntington, West Virginia 25701
Telephone: (304) 697-4700
Facsimile: (304) 697-4714
Email: tlc@bcysfirm.com
Email: dda@bcysfirm.com
Email: mel@bcysfirm.com

and

15

_/s/ Robert M. Duncan, Jr._
Robert M. Duncan, Jr. (Ky. Bar No. 89821) (pro hac vice)
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, Kentucky 40507
Telephone: (859) 425-1000
Facsimile: (859) 425-1099
Email: robert.duncan@dinsmore.com

and

_/s/ David R. Stone_
David R. Stone (W. Va. Bar No. 12824)
Dinsmore & Shohl LLP
215 Don Knotts Blvd., Suite 310
Morgantown, West Virginia 26501
Telephone: (304) 296-1100
Facsimile: (304) 296-6116
Email: david.stone@dinsmore.com

## Notice of Class Action Settlement Approval

*Martha Blenko, et al. v. Cabell Huntington Hospital*
Case No. 3:21-cv-00315
United States District Court for the Southern District of West Virginia

The Court has approved the settlement of the class action lawsuit that is currently pending in the U.S. District Court for the Southern District of West Virginia, Case No. 3:21-cv-00315. The named plaintiffs and the certified class representatives in this action are Martha "Marty" Blenko (a post-65 retiree), Laura Mullarky (a pre-65 retiree), and Jane Doe (a post-65 retiree). The Plaintiffs allege that Cabell Huntington Hospital ("Cabell") repeatedly represented to Defendant's employees that they could retire as non-union employees beginning at age 62 and retain their health insurance if they had attained 17 years of credited service. Cabell further informed the Plaintiffs Cabell would provide comparable health insurance to the non-union retirees until they became Medicare-eligible, and that Cabell would then provide a comparable, cost-free Medicare supplement throughout the rest of those retirees' lives. Cabell denies these allegations.

**The approved settlement is anticipated to take effect on or about January 30, 2023. If you typically enroll in a Medicare Supplement on an annual basis during open enrollment, you should do so as usual this year. This settlement will provide a Health Reimbursement Arrangement (HRA) for each class member in the amount of $18,950.48 to cover qualified medical expenses. This will replace the monthly HRA contributions that Cabell has been making. Those monthly allotments will no longer occur once the settlement becomes final and Cabell funds the new HRA. The new HRA will also feature a $500,000.00 High-Risk Fund to cover the last dollar of qualified medical expenses that are not fully paid for by insurance or Medicare supplements, such as specialty drugs.**

**This Notice contains a Summary Plan Description for the HRA benefits that will be available to you when the settlement becomes final. Please read this SPD, which informs you of your rights and responsibilities under the new HRA created by this settlement. The background on the settlement was described fully in a previous notice that you received.**

The Court has authorized this Notice of the Settlement Approval in the class action lawsuit referenced above.

The purpose of this notice is to explain the nature of the lawsuit and to inform you of your legal rights. If you have any questions, contact Attorney Sam Petsonk: (681) 207-7510.

## A.    THE NATURE AND COURSE OF PROCEEDINGS.

This lawsuit sought to recover relief under the Employee Retirement Income Security Act (ERISA) because the Defendant (Cabell) repeatedly represented to its employees that they could retire as non-union employees beginning at age 62 and retain their health insurance if they had attained 17 years of credited service. Cabell further informed their employees that Cabell would

1

provide comparable health insurance to the non-union retirees until they became Medicare-eligible, and that Cabell would then provide a comparable, cost-free Medicare supplement throughout the rest of those retirees' lives.

On January 28, 2021, Cabell issued a form letter addressed to "Dear Retiree," distributed to the Pre-65 and Post-65 retirees, which Plaintiffs received, stating that they would terminate retiree welfare benefits on March 31, 2021. The letter stated that, as of April 1, 2021, the Pre-65 retirees would be charged a premium to cover a portion of the cost of the coverage if they chose to remain enrolled in the plan and that such coverage would then terminate when they turned 65 or first became Medicare-eligible.

On February 12, 2021, Cabell issued another "Dear Retiree" form letter to the Post-65 retirees stating that Cabell was extending benefits to May 31, 2021.  On March 8, 2021, Cabell issued yet another form letter to the Pre-65 retirees, stating that Cabell was extending benefits to June 30, 2021.

In April 2021, Cabell issued an additional letter to the retirees notifying them of an extension in the retiree healthcare coverage for the Post-65 Retirees through September 30, 2021 and offering to deposit $250 per month into a Health Reimbursement Account (HRA) in lieu of providing the Medicare Supplement to the recipients of that letter.

In the April 1 letter, Cabell asserted for the first time a right to terminate the HRA and its funding at any time. As to the Pre-65 retirees, Cabell further announced it would pay 100% of retirees' medical and prescription benefits until June 30, 2021, and effective July 1, 2021, retirees will begin paying a portion of the premium for their Pre-65 Retiree Health Plan (medical and prescription drug).  This coverage for Pre-65 retirees would then terminate on September 30, 2021, leaving only the HRA.

On May 25, 2021, Attorney Sam Petsonk of Petsonk PLLC, and Mountain State Justice, filed this lawsuit on behalf of Plaintiffs Blenko and Mullarky, and thereafter added an additional Plaintiff Jane Doe, seeking relief for the class under ERISA to prevent or reduce the harm suffered by the Plaintiffs due to the Defendant's proposed termination of retiree healthcare.  After this Complaint was filed, Cabell issued a notice on June 14, 2021 that they would extend the premium-free coverage for Pre-65 retirees through October 1, 2021. Cabell further stated it would refund any premiums that Pre-65 retirees already paid ahead of schedule pursuant to Cabell's prior notice, which had indicated that premiums would become due on July 1, 2021.

On August 26, 2021, the Plaintiffs filed a Motion for Preliminary Injunction to bar the Defendants from curtailing or terminating the benefits that they allegedly promised. On September 24, 2021, the Court granted temporary relief in response to the Motion for Preliminary Injunction, and modified that relief on September 27, 2021. On October 8, 2021, the Court denied the Motion for Preliminary Injunction, and the case has proceeded in litigation.

On October 31, 2022, the Court held a fairness hearing and approved the settlement. The approval will become final on January 30, 2022, barring any proper objections.

On May 24, 2022, the Parties reached a Mediation Agreement to resolve this litigation for a total sum of $5,694,500.00. One class member opted out of the settlement, raising the per capita allotment to $18,950.48.

The Court has not rendered judgment on the merits of the claims in the case.

2

**B.    THE APPROVED SETTLEMENT.**

(1)    <u>**Summary Plan Description**</u>:  The terms of the HRA are set forth in the attached Summary Plan Description.  If you have any questions about your benefits under this HRA going forward, you may contact **Walters Administration, LLC, 16 Capitol Street, Charleston, West Virginia 25301, (304) 346-4823.**

**C.    WHAT TO DO NOW.**

(1)    **Confirm that your address is correct.** If you did not receive this mailing at the correct address, contact Walters Administration and inform them of the correct address for future mailings.

(2)    **Enroll in Medicare Supplement if desired.** Once the settlement is paid and becomes final, you will cease receiving monthly HRA allotments as you have been receiving. Instead, you will have the lump sum HRA of $18,950.48 to use in keeping with the SPD.

(3)    **DO NOT ADDRESS QUESTIONS ABOUT THE SETTLEMENT OR THE LITIGATION TO THE CLERK OF THE COURT OR TO THE JUDGE.**

Sam B. Petsonk, Esq.
Petsonk PLLC
PO Box 1045
Beckley, WV 25802
(304) 712-9858
*Class counsel*

Bren J. Pomponio, Esq.
Mountain State Justice, Inc.
223 Prince Street
Beckley, WV 25801
(681) 207-7510
*Class counsel*

## HEALTH REIMBURSEMENT ACCOUNT PLAN AND SUMMARY PLAN DESCRIPTION FOR NON-BARGAINING UNIT CHH RETIREES

This document serves as the Plan and Summary Plan Description for the above-named welfare benefit plan created as part of the settlement reached in the civil lawsuit captioned *Martha Blenko, et al. v. Cabell Huntington Hospital, Inc.*, Civil Action No. 3:21-cv-315 (S.D.W.Va.).

(a) The name of the Plan: "Health Reimbursement Account Plan for Non-Bargaining Unit CHH Retirees," also known as the "Non-Union Retirees HRA Plan"

(b) The name and address of the former employer whose employees are covered by the plan is Cabell-Huntington Hospital, Inc. ("CHH"), 1340 Hal Greer Boulevard, Huntington, WV 25701. The employer identification number (EIN) assigned by the Internal Revenue Service of CHH is 55-0675666.

Note: Participants and beneficiaries may receive from the plan administrator, upon written request, information as to whether a particular employer or employee organization is a sponsor of the plan and, if the employer or employee organization is a plan sponsor, the sponsor's address.

(c) The Plan number assigned by the plan sponsor: 601.

(d) The Plan is a health reimbursement account (HRA) plan.

(e) The Plan is administered by a contractor known as a third-party administrator.

(f) The name, business address and business telephone number of the Plan's third-party administrator: Walters Administration, LLC, 16 Capitol Street, Charleston, West Virginia 25301, (304) 346-4823.

(g) The trustee of the Plan is Walters Administration, LLC, 16 Capitol Street, Charleston, West Virginia 25301.

(h) Service of legal process may be made upon the Plan trustee or Plan administrator as designated agent for the Plan.

(i) The Plan's requirements respecting eligibility for participation and for benefits: The individuals eligible for coverage under this Plan are the 210 final class members covered by the settlement of the civil lawsuit captioned *Martha Blenko, et al. v. Cabell Huntington Hospital, Inc.*, Civil Action No. 3:21-cv-315 (S.D.W.Va.).

(j) The benefits provided by the Plan are as follows:

     i. Health Reimbursement Accounts. Each Plan participant will receive an HRA containing $18,950.48 to be used for qualified medical expenses.

1

ii. High-Risk Fund. A High-Risk Fund of $500,000.00 will be available from CHH as an additional benefit within the HRA for any costs that have been denied after being submitted to a health insurer or Medicare supplement. No class member may draw more than $10,000.00 in benefits from the HRA's High-Risk Fund, to preserve a fair allocation of the fund.

iii. Continued health insurance for Pre-65 Retirees. Class members who have not yet reached the age of Medicare eligibility shall continue to be eligible to receive the same coverage offered to non-union employees under Defendant's medical benefit program (and will be responsible for paying applicable premiums) until reaching the age of Medicare eligibility.

iv. When and How Your Prior HRA Coverage Terminates. For those who have reached their age of Medicare eligibility (the "Medicare-eligible" class members), the health care provided by CHH prior to the settlement of the *Blenko* case will continue until midnight on the date by which all of the following have occurred: (1) the end of the class opt out period; (2) the United States District Court's approval of the settlement; and (3) the funding of the qualified settlement fund (the "Coverage Termination Date"). Plan participants who are Medicare-eligible shall be entitled to the reimbursement of eligible medical benefits incurred on or before the Coverage Termination Date, provided such claims are properly submitted as required under and in accordance with the terms of CHH's prior medical benefits program within sixty (60) days after the Coverage Termination Date. Claims submitted by Medicare-eligible class members after that claims submission deadline (as described in the preceding sentence), regardless of when they were incurred, shall not be eligible for reimbursement under CHH's prior medical benefits program. In addition, no claims incurred by Medicare-eligible class members after the Coverage Termination Date shall be eligible for reimbursement under CHH's prior medical benefits program.

v. Timing and method of establishing HRA. Defendant shall pay the sum set forth in this Agreement into a qualified settlement fund and those payments shall be allocated by the Settlement Administrator to their respective purposes according to this Agreement. Payment into the qualified settlement fund shall be made by the Defendant within 90 days after the end of the opt-out period, the approval of class certification, or the final approval of the settlement by the United States District Court, whichever occurs last.

vi. Administration of HRA. The HRA is to be administered by the Settlement Administrator, which is Walters Administration, LLC. Wesbanco will hold the payments in a qualified settlement fund and begin processing payments as promptly as possible once the Court approves the settlement and CHH funds the accounts.

vii. Class administration fee. CHH agreed to pay a class administrative fee, which will be allocated to Walters Administration and Wesbanco, of $175,000.00 in order to cover the costs of the administration of the HRA, including claims on the High-Risk Fund within the HRA. The administration of the HRA will not entail ongoing bank fees.

viii. Cy pres (leftover amounts). Any unclaimed portion of the settlement proceeds after the last class member passes away will be distributed as follows: 1/3 to the Cabell Huntington Hospital Foundation; 1/3 to the Cabell Huntington Hospital Foundation for the benefit of the

2

Cabell Huntington Hospital Outpatient Pediatric Rehab Center; and 1/3 to the American Cancer Society.

(k) The terms for receiving distributions from the HRA are as follows:

   i. The primary allocations under the HRA ($18,950.48 per participant) may be used for any expense covered by Medicare Part B or D (so-called "213(d)" expenses). These primary allocations may be used for any medical, dental, vision, hearing aid, or pharmaceutical costs related to the treatment of a class member, their spouse, or dependents.

   ii. The High-Risk Fund only provides for expenses that are: a) covered under Medicare Part D (i.e. pharmaceutical), b) incurred for the treatment of a class member, and c) not paid for by class member's Part D Plan. When submitting expenses for reimbursement from the High-Risk Fund, a class member must have a Part D plan, and must submit the bill to the settlement administrator along with an explanation of benefits, or other proof of rejection of coverage by the class member's Part D plan.

   iii. The High-Risk Fund carries a per capita lifetime cap of $10,000.00 per class member.

   iv. If any of an individual's primary allocation remains unspent under the HRA upon the death of the individual, such sums will be retained by the Plan for the High-Risk Fund following the death of each such individual and the full payment of covered costs to the estate of the deceased for all such costs that were incurred prior to the participant's death.

(l) Circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery (e.g., by exercise of subrogation or reimbursement rights) of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide include actions by the government to reduce or encumber the funds of the Plan, or the failure of the bank holding the assets of the Plan.

(m) *Termination or Curtailment Not Permitted by Plan Sponsor*. The plan sponsor does not have authority to terminate the plan, but retains the authority to amend or eliminate benefits under the plan in the circumstance in which a court or government agency takes action against the Plan causing a reduction, rescission or enhancement of the funds available. No benefits are vested or may become vested under this Plan. This Plan contains no provisions that may result in the imposition of a fee or charge on a participant or beneficiary, or on an individual account thereof, the payment of which is a condition to the receipt of benefits under the plan. The foregoing summaries are disclosed in accordance with the requirements under 29 CFR 2520.102-2(b).

(n) The source of contributions to the plan is Cabell Huntington Hospital, Inc. Upon funding the plan as provided in the settlement agreement, Cabell Huntington Hospital, Inc., will have no responsibility for administering the plan or for the funds in the Cabell Huntington Hospital Non-Union Retirees Qualified Settlement Fund, its investments and administration or disbursements therefrom.

3

(o) The funding medium used for the accumulation of assets through which benefits are provided: Wesbanco Bank and Insurances Services maintains individual health reimbursement procedures for provision of reimbursement to class members up to the amount of $18,950.48 per class member, as supplemented by funds from the High Risk Fund.

(p) The date of the end of the year for purposes of maintaining the plan's fiscal records: December 31.

(q) The procedures governing claims for benefits will be set forth by Wesbanco in a Claims Procedure Guide issued by Wesbanco, setting forth procedures for filing claim forms, providing notifications of benefit determinations, and reviewing denied claims, applicable time limits, and remedies available under the Plan for the redress of claims which are denied in whole or in part. The Plan's claims procedures will be furnished by Claims Procedure Guide, which is a separate document, consistent with the requirements of 29 CFR 2520.102-2. These claims procedures are furnished automatically, without charge, as a separate document.

(r) *Statement of ERISA rights as required by Federal law and regulation:*

As a participant in the Health Reimbursement Account Plan for Non-Bargaining Unit CHH Retirees, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides all plan participants shall be entitled to:
*Receive Information About Your Plan and Benefits*
Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.
Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.
Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

*Prudent Actions by Plan Fiduciaries*

In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a (pension, welfare) benefit or exercising your rights under ERISA.

4

*Enforce Your Rights*

If your claim for a welfare benefit is denied or ignored, in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request a copy of plan documents or the latest annual report from the plan and do not receive them within 30 days, you may file suit in a Federal court. In such a case, the court may require the plan administrator to provide the materials and pay you up to $110 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or Federal court. In addition, if you disagree with the plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in Federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a Federal court. The court will decide who should pay court costs and legal fees. If you are successful the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

*Assistance with Your Questions*

If you have any questions about your plan, you should contact the plan administrator. If you have any questions about this statement or about your rights under ERISA, or if you need assistance in obtaining documents from the plan administrator, you should contact the nearest office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in your telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue N.W., Washington, D.C. 20210. You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.